WO

MGD

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

John Leonard Harris,

Plaintiff,

v.

Charles L. Ryan, et al.,

Defendants.

No.  CV 19-02723-PHX-JAT (ESW)

**ORDER**

Plaintiff John Leonard Harris, who is currently confined in the Arizona State Prison Complex-Florence, filed this pro se civil rights action pursuant to 42 U.S.C. § 1983. (Doc. 1.)   Pending before the Court are Defendant Centurion of Arizona, LLC's ("Centurion") Motion for Summary Judgment (Doc. 26), Defendants Arizona Department of Corrections (ADC) Director Shinn and Corizon Health Incorporated's ("Corizon") Motion for Summary Judgment (Doc. 32), and Plaintiff's Motion for Default Judgment (Doc. 44).   Centurion joined Shinn and Corizon's Motion for Summary Judgment with respect to Plaintiff's injunctive relief claims.  (Doc. 37.)  The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), regarding the requirements of a response to the Motions for Summary Judgment (Docs. 34, 35), and he opposes the Motions (Docs. 36, 39).

## I.    Background

In his Complaint dated April 22, 2019, Plaintiff alleges that he received inadequate medical care for deformities in his feet.  (Doc. 1.)  Plaintiff alleges that in July 2016, Dr.

Cory reconstructed his left foot and ordered Plaintiff to return in 4 weeks to have sutures removed, to receive injections in both feet for pain, and to return in a year for surgery on his right foot.  (*Id*. at 3, 5.)  Plaintiff did not return to Dr. Cory in 4 weeks to have the sutures removed, did not receive the pain injections, and had not received the surgery on his collapsed right foot as of the time he filed his Complaint, which further hindered his mobility and ability to work.  (*Id*. at 5-6.)  Plaintiff seeks damages and injunctive relief in the form of "immediate treatment/surgery."  (*Id*. at 9.)

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated Eighth Amendment medical care claims in Counts One and Two against Corizon and former ADC Director Ryan, in his official capacity, and directed Corizon and Ryan to answer.  (Doc. 5.)  The Court dismissed the remaining claims and Defendants.  (*Id*.)  Because Ryan is no longer the ADC Director, on December 20, 2019, the Court substituted current ADC Director David Shinn for Ryan in his official capacity.  (Doc. 16.)  Also, because Corizon is no longer the contracted healthcare provider for ADC prisoners, the Court added Centurion, the new contracted healthcare provider, as a Defendant with respect to Plaintiff's request for injunctive relief.  (*Id*.)

## II.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the

governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**III.    Plaintiff's Motion for Default Judgment**

On September 9, 2020, after briefing was complete on Defendants' Motions for Summary Judgment, the Court ordered Defendants to provide the records from Plaintiff's foot surgery and Plaintiff's follow-up visits with the surgeon or other outside providers. (Doc. 42.) On September 16, 2020, Defendants filed a Notice of Service of Discovery stating that pursuant to the Court's September 9, 2016 Order, they had served Plaintiff with a copy of supplemental medical records.[1]  (Doc. 43.)

On September 25, 2020, Plaintiff filed a Motion for Default Judgment pursuant to Federal Rule of Civil Procedure 37(b), asserting that Defendants failed to comply with the Court's Order at Doc. 42 and did not provide the surgeon's or other outside providers' "actual dictated notes/reports" but only produced "offsite forms that return with Plaintiff from every appointment." (Doc. 44 at 1.) As such, Plaintiff argues that Defendants have

---

[1] Because Defendants apparently misunderstood the Court's September 9 Order, the Court, on September 30, 2020, ordered Defendants to file the evidence described in the September 9 Order with the Court. (Doc. 45.) Defendants then filed additional medical records with the Court on October 2, 2020. (Doc. 46.)

exhibited bad faith "by refusing to produce relevant documents detrimental to their defense." (*Id.*)

Defendants Corizon and Ryan, joined by Defendant Centurion, respond that they did comply with the Court's Orders and provided all relevant outside consult records that are in Plaintiff's medical record. (Doc. 47 at 1.) They argue that they are only required to produce medical records that are in their custody or control and they are not required to search for and retrieve documents from outside sources. (*Id*. at 1-2.)

In *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197 (1958), the Supreme Court held that the question of whether dismissal should be ordered because of noncompliance with a discovery order "depends exclusively upon Rule 37" and that "[t]here is no need to resort to Rule 41(b)." *Id.* at 207. Rule 37(b)(2)(A) empowers the Court to issue appropriate sanction orders when a party fails to comply with discovery orders, including by barring the disobedient party from introducing certain evidence, directing that certain facts shall be taken to be established, dismissing the action in whole or in part, or rendering a default judgment against the disobedient party. Fed. R. Civ. P. 37(b)(2)(A)(i)-(vii); *see also Roadway Express v. Piper*, 447 U.S. 752, 763 (1980). The Court retains broad discretion in selecting the appropriate sanction, but if the sanction ordered is less than dismissal, the party's noncompliance need not be proven to be willful or in bad faith. *See, e.g., Von Brimer v. Whirlpool Corp.*, 536 F.2d 838, 843-44 (9th Cir. 1976); *see also Societe Internationale*, 357 U.S. at 208.

Here, there is no evidence that Defendants have been noncompliant with the Court's Orders, and the Court will therefore deny Plaintiff's Motion for Default Judgment.

**IV.    Relevant Facts**

On October 12, 2015, Plaintiff submitted an Inmate Letter to Ryan stating that he had been trying to get treatment for his foot and ankle for 2 years and that "both doctors said I need surgery." (Doc. 40-1 at 12.) Plaintiff further wrote that Dr. Sharp, who worked for Corizon, had requested surgery for Plaintiff in July and September and told Plaintiff that only a specialist could give him shots in his feet and ankles. (*Id.*) Vanessa Headstream,

Program Evaluation Administrator in ADC's Health Services Contract Monitoring Bureau, responded that Plaintiff was evaluated in December 2014 by a podiatrist, and that Plaintiff had since received the recommended custom fit left ankle brace, medical shoes and inserts, and that a consult for podiatry had been approved and was being scheduled.  (*Id*. at 13.)

On February 10, 2016, Plaintiff saw Dr. John Cory, MD, at OrthoArizona, The Foot and Ankle Center.  (Doc. 33-1 at 2.)  Dr. Cory examined Plaintiff and reviewed -x-rays of the left foot, noting "pes planus deformity bilaterally more significantly left than right," "Early pes planovalgus deformity right foot," and "Severe end-stage stage IV planovalgus deformity/posterial tibia tendon dysfunction."  (*Id*. at 3.)  Dr. Cory recommended surgery of the left lower extremity and an "offloading Arizona brace" for the right foot, which Plaintiff should have prior to surgery on the left lower extremity "due to increased strain on the contralateral leg in the postoperative period."  (*Id*. at 4.)

On March 28, 2016, Plaintiff submitted an Informal Complaint Resolution stating that he was being denied adequate medical care for his left foot and ankle and that a bone was "perforating through [his] skin."  (Doc. 40-1 at 32.)  Plaintiff wrote that Dr. Cory stressed the importance of getting a brace made immediately for Plaintiff's right foot and ankle before it "also collapse[s] out of joint."  (*Id*.)  Plaintiff said the bone "pushing through [his] foot and leg is excruciating," and the pain was causing anxiety and chest tightness.  (*Id*.)  Plaintiff submitted a second Informal Complaint Resolution that same day about trying to get medical shoes for 8 months and that Dr. Price said that the worn-out shoes Plaintiff had did not help with the custom brace for Plaintiff's left foot and ankle.  (*Id*. at 35.)  Registered Nurse (RN) C. Smith responded to both Informal Complaints on April 29, 2016, stating that Plaintiff was scheduled for an orthotics appointment and that the shoes ordered for Plaintiff had arrived and were being sent to ADC property.  (*Id*. at 33, 36.)

On May 2, 2016, Plaintiff was evaluated for custom left and right foot ankle-foot orthosis (AFOs) and custom leather laced braces, which were delivered on May 24, 2016.  (Doc. 33 ¶ 2.)

On July 29, 2016, Plaintiff had left ankle surgery at Thompson Peak Hospital. (Doc. 33 ¶ 3.) Defendants do not provide the hospital records of the surgery but only submit one page of "General Home Care Instructions" instructing Plaintiff to use crutches and to elevate his leg 20-22 hours a day for 4 weeks. (Doc. 46 at 5.) Defendants also submit Corizon's medical record of Plaintiff's return from the surgery, which noted that Plaintiff was in a wheelchair with a bandage on his left leg, his pain level was 8 out of 10, and he was prescribed acetaminophen 300 mg with codeine (Tylenol #3) twice daily as needed. (Doc. 33-1 at 10-12.) Plaintiff was issued a Special Needs Order (SNO) for a wheelchair, a foam wedge, a lower bunk, meals in his living quarters, and no duty. (*Id*. at 14.)

On August 2, 2016, Plaintiff had an offsite appointment with Dr. Cory at OrthoArizona.[2] (*Id*. at 21.) Corizon's form that the outside provider completed shows a diagnosis of hind foot collapse and that Dr. Cory prescribed Vicodin and ordered Plaintiff to return in 2 weeks for a cast change.[3] (Doc. 46 at 4.) Upon Plaintiff's return from this appointment, Plaintiff reported that a popped blister was cleaned and dressed, and a cast was placed on his left leg. (Doc. 33-1 at 21.) It was noted that Plaintiff was ambulatory and using crutches to get around and that he would follow up in 2 weeks for a cast change.[4] (*Id*.)

On August 29, 2016, Plaintiff had a follow-up visit with Dr. Cory, who noted on Corizon's form that Plaintiff's stiches were taken out that day and that Plaintiff was to return in 2 weeks for x-rays and to transition into a controlled ankle motion (CAM) boot.

---

[2] The handwriting on the Practitioner Consultation Reports sometimes say the offsite appointments were at "AZ Ortho" or "AZ Foot & Ankle." Because the masthead shows the clinic name as "OrthoArizona The Foot & Ankle Center" (*see* Doc. 46 at 8), the Court will use the name OrthoArizona for consistency.

[3] The other notes on the form are illegible. Defendants did not submit any medical records from Dr. Cory's office other than its own Practitioner Consultation Report.

[4] Plaintiff states that he partially disputes this record because "this encounter was not closed for 29 days nor is there an employee signature on this record. This is a violation of *Parsons v. Shinn* Performance Measure 7." (Doc. 40 at 2.) Plaintiff, though, does not dispute the contents of the record. The Court will not further note when Plaintiff raises disputes of non-compliance with *Parsons'* recordkeeping measures but does not dispute the information in the cited evidence.

(Doc. 46 at 7.)  When he returned from the offsite-appointment, Plaintiff saw RN Maurice Owiti, who noted that Plaintiff was unable to put pressure on his left foot, and he was still using a wheelchair and crutches.  (Doc. 33-1 at 34.)  (*Id*.)  On September 14, 2016, Plaintiff had an appointment at OrthoArizona.  (Doc. 46 at 9.)  Plaintiff saw Nurse Owiti upon his return from the appointment, and Owiti noted that Plaintiff now had a CAM boot and orders to follow up in 4 weeks.  (Doc. 33-1 at 41-42.)

On October 20, 2016, Plaintiff had an offsite appointment at OrthoArizona where he was instructed to have a wet-to-dry dressing on a wound, to remain in the CAM boot until the wound was healed, and to return in 4 weeks for a wound check.  (Doc. 46 at 10.)  On October 21, 2016, Plaintiff saw RN Owiti, who noted that Plaintiff was at risk for infection from an open wound and that Plaintiff was to have a wet-to-dry dressing change to the lateral aspect of his foot daily.  (Doc. 33-1 at 62-63.)

On October 26, 2016, Plaintiff requested that his SNO for ice be renewed "for stiffness and swelling of the ankle, foot & knee." (*Id*. at 85.)  On October 28, 2016, Plaintiff saw RN Johnson and rated his pain at 8/10 and said the pain was chronic, achy and burning.  (*Id*. at 86.)  Johnson noted that Plaintiff's ankle "has a swollen sight [sic] on the inside" and was slightly warm to the touch, and Johnson instructed Plaintiff to use ice daily, continue with dressing changes, and to follow up as needed.  (*Id*. at 87, 90.)

On November 13, 2016, Plaintiff submitted an HNR stating that there was a problem with his right foot and ankle just like he had with the left one and it was causing severe pain that made it hard to walk.  (Doc. 40-3 at 24.)  On November 15, 2016, Plaintiff saw RN Johnson, who noted that Plaintiff wanted to know "what is going to be done with his right foot now that the left one has been corrected," and that Plaintiff said his foot and ankle were causing a lot of pain, which he rated at 7/10.  (Doc. 33-1 at 95.)  Johnson noted that Plaintiff's gait was steady, he had a boot on the left foot and a brace on the right, and his right ankle was "leaning into the inner right side and the foot is flat." (*Id*. at 96.)  Johnson's plan was to talk to a provider about putting in a referral for the right foot.  (*Id*. at 98.)

On November 26 and December 2, 2016, Plaintiff submitted HNRs stating that his right brace still needed to be adjusted by Hanger Orthotics, that he needed proper shoes to wear with the braces, and that his right foot was very painful without proper footwear. (Doc. 40-3 at 28, 30.)  In a December 5, 2016 Informal Complaint Resolution, Plaintiff wrote that his medical shoes and braces were "blown out and causing pain unnecessarily because of untimely care."  (*Id*. at 2.)

On December 6, 2016, Plaintiff saw NP Denehy for a reevaluation of the slow-healing wound on his left foot.  (Doc. 33-1 at 106.)  Denehy noted that Plaintiff "saw ortho in October, and they wanted him to return in 30 days to reevaluate the wound that has been slow to heal.  Wound healing well, almost completely closed."  (*Id*.)  Denehy's plan of care was for Plaintiff "to [follow up] with ortho prn [as needed]."  (*Id*. at 108.)

On December 7, 2016, Plaintiff submitted an HNR about his shoes, stating that his boots were not made to fit his braces and he urgently needed new medical shoes because he was in a lot of pain due to shoes that did not fit properly.  (Doc. 40-3 at 32.)  On December 8, 2016, Plaintiff saw RN Owiti regarding his shoes and brace, which Plaintiff thought he would be fitted for after the surgery.  (Doc. 33-1 at 110.)  On January 19, 2017, NP Denehy submitted a Consultation Request for medical shoes.  (*Id*. at 121.)

In January, February and March 2017, Plaintiff submitted additional HNRs, an Informal Complaint Resolution, and a Grievance about the lack of medical shoes, the pain he was suffering in his lower back and feet and ankles due to the lack of support, and the need to have his brace adjusted.  (*See* Doc. 40-4 at 17, 20, 23, 26.)  On April 7, 2017, Hanger Orthotics saw Plaintiff for the casting and measurement for Gauntlet and extra depth shoes.  (Doc. 33-1 at 130.)  Plaintiff's new shoes were delivered on April 28, 2017. (*Id*. at 136.)

On August 31, 2017, Plaintiff saw RN Allison Poe about the pain in his right foot and ankle; Plaintiff said he needed to see the doctor about having surgery on his right foot and ankle.  (*Id*. at 142.)  Poe noted that Plaintiff's gait was unsteady, that he wore braces on both legs, and had a right leg deformity.  (*Id*. at 143.)

On September 18, 2017, Plaintiff saw NP Dorothy Igwe and requested surgery on his right foot, which he said was collapsing due to bone deterioration and that his ankle bone was "rolling off the foundation." (*Id*. at 149.)  Plaintiff reported his pain as 8/10 and that the pain affected his lower back and disrupted his balance. (*Id*.)  Plaintiff reported that he walked 2 miles every 3 days and did cardio 3-4 times a week, but he was unable to run. (*Id*.)  Igwe noted that Plaintiff's left foot had well-healed scars, his right foot was in a brace, his gait was unsteady, and his feet were flat.  (*Id*.)

On December 13, 2017, Plaintiff saw NP Deborah McGarry.  (Doc. 33-2 at 2.) McGarry wrote in her assessment: "[s]evere end-stage stage IV planovalgus deformity/posterior tibia tendon dysfunction[.]  Pt [patient] had surgical repair of the same deformity on the left foot 17 months ago.  He now needs to see Dr. Cory for surgical consult to repair the right foot deformity.  Pt is unable to walk without AFO brace.  He has early diabetes and is at increased risk for loss of limb."  (*Id*. at 5.)  McGarry requested an off-site orthopedics consult, but the request was denied, and an alternative treatment plan (ATP) issued.  (*Id*.)  The ATP by Alyssa Roulston states:

> Previous ortho note indicates that the right foo[t] deformity was evaluated at the same time as the left. . . .  Right foot was noted to have early pes planovalgus deformity (unlike the severe deformity on the left), with physical exam showing full range of motion and overall neutral alignment.  The surgeon recommended bracing for the right foot.  There is currently not evidence of significant change or worsening.  The patient is able to walk with orthotic device.  Consider continuing conservative management.

(*Id*. at 10.)

On January 18, 2018, Plaintiff saw NP Igwe to review the ATP.  (*Id*. at 15.)  Plaintiff reported increasing right ankle and foot pain and inability to walk without the left foot orthotics and ankle brace.  (*Id*.)  Plaintiff rated the pain as 8/10, sharp and constant.  (*Id*.) Igwe noted Plaintiff had a flat right foot without cyanosis or edema, a right foot deformity, unsteady gait without the right foot brace, and "asymmetrical alignment of RLE [right lower extremity] with the left."  (*Id*.)  Igwe's plan was to request an off-site orthopedics

consult as Plaintiff presented with worsening pain.  (*Id*. at 17.)  Igwe submitted a Consultation Request that day stating that she was "[a]ppealing current ATP as [patient] presents with worsening severe R. foot deformity per today's assessment.  P[atient]t will benefit from orthopedic assessment for possible surgical repair."  (Doc. 40-6 at 24.)  The appeal was referred to the UM team for review and an ATP was issued by LPN David Ellison with essentially the same wording as the previous ATP.  (*See id*. at 25, 27.)

On March 1, 2018, Plaintiff submitted an Informal Complaint Resolution stating that he needed to see Dr. Cory because his right foot was causing excruciating pain, the brace did not stop the pain, his left leg was now longer than his right because his ankle was straightened and that has caused Plaintiff to walk with a limp and suffer lower back pain. (Doc. 40-6 at 6.)

Plaintiff saw NP Igwe again on March 20, 2018 to review the ATP recommendation, which appears to be the same ATP issued in December 2017.  (*See* Doc. 33-2 at 19.) Plaintiff requested medical shoes "to provide needed support for his deformed feet" and he reported instability on the right with ambulation.  (*Id*.)  Igwe planned to issue a SNO for medical shoes and insoles.  (*Id*. at 21.)

Plaintiff submitted an Informal Complaint Resolution on April 20, 2018 about the pain in his right foot and stating that he had not received shoes, insoles, ice or treatment to help with his pain and suffering.  (Doc. 40-6 at 8.)  RN Diaz responded that inmates do not dictate care and that Plaintiff should submit an HNR to be seen by medical to discuss his issues.  (*Id*. at 9.)

On May 2, 2018, Plaintiff saw NP Igwe and reported stress, anxiety and chest pain related to his back and leg pain and that "the whole process of not getting proper care related to getting his medical shoes with hanger orthotics coupled with being in prison and associated delays in getting the thing he needs cause him a lot of stress and anxiety." (Doc. 33-2 at 28.)  Igwe's plan was to prescribe Robaxin or Flexeril and to refer Plaintiff to mental health.  (*Id*. at 30.)

On May 18, 2018, Plaintiff submitted an HNR stating he had received no care or medical shoes or insoles since February 21, 2017 and that walking was very painful with every step. (Doc. 40-5 at 15.) Plaintiff said one leg was longer than the other because one was repaired, and the other foot and ankle were collapsing and causing back pain. (*Id.*)

On May 25, 2018, Plaintiff submitted an Inmate Letter to Vanessa Headstream stating that his right foot had taken a turn for the worse, was pulling on his achilles tendon, and the pain was taking a toll on him. (Doc. 40-6 at 11.) Plaintiff wrote that he had lost many educational opportunities to help take care of his family when he is released in 2021 and that the injury had sidelined him from returning to welding. (*Id.*)

Plaintiff saw NP Igwe on May 29, 2018, and again requested medical shoes and surgery to repair his right foot "the way they fixed [his] l[eft] foot." (Doc. 33-2 at 33.) Plaintiff reported that his left foot surgery was successful without complications or rehab and that he now had excruciating pain in his right foot, walking was difficult and affected his back, and his pain was 9/10, sharp and throbbing. (*Id.*) Plaintiff was taking naproxen and Tylenol. (*Id.*) Igwe noted that they discussed "ATP medical shoes" and that Plaintiff said he needed medical shoes to accommodate the custom ankle brace. (*Id.*) Igwe planned to resubmit the offsite consult for foot surgery and appeal the ATP for medical shoes. (*Id.*)

The next day, Igwe submitted the consult request for off-site orthopedics for an evaluation "for possible surgical repair of severe end-stage stage IV planovalgus deformity/posterior tibia tendon dysfunction." (*Id.* at 43.) The orthopedic consult request was referred to the UM team for review, which rejected the request, and LPN David Ellison issued an ATP stating, "Previous ortho note indicates a recommendation[] of bracing for the right foot. There is currently not objective evidence of significant changes or worsening leading to an inability to carry out ADLs or severe pain that cannot be controlled with noninvasive measures. The patient is able to walk with orthotic device. Consider continuing conservative management." (*Id.* at 45-46.) Plaintiff discussed the ATP with Igwe at his visit on June 7, 2018. (*Id.* at 40.) Plaintiff requested a different pain medication for his back pain and custom-fitted medical shoes. (*Id.*) Igwe discontinued Plaintiff's

naproxen, prescribed alpha lipolic acid, and told Plaintiff they were unable to issue a new pair of custom shoes because the current pair were still in good condition.  (*Id*. at 42.)

On June 22, 2018, Vanessa Headstream responded to Plaintiff's May 25 Inmate Letter, stating Corizon UM had issued an ATP for the orthopedic consult request "to include your orthotic device and conservative management." (Doc. 40-6 at 12.)

On July 6, 2018, Plaintiff submitted an HNR stating that alpha lipoic acid was not helping his extreme pain, that his leg was "collapsing off the foundation of [his] foot," and that he tried daily to physically and mentally cope with the situation without any help. (Doc. 33-2 at 49.)  Plaintiff saw NP Igwe on July 9, 2018 about his right foot/ankle pain and Igwe discontinued alpha lipoic acid and restarted naproxen.  (*Id*. at 51, 53.)

On July 18, 2018, Plaintiff submitted an Informal Complaint Resolution about the excruciating pain in his right foot that was affecting his balance and causing lower back pain because one leg was longer than the other and he requested to see Dr. Cory.  (Doc. 40-6 at 14.)   Deputy Warden Stickley responded that he had forwarded Plaintiff's information to the Program Evaluation Administrator for review and that "Ms. Headstream is reviewing your case and has a meeting scheduled with Corizon." (*Id*. at 15.)  On August 15, 2018, Director of Nursing Cortiss responded to Plaintiff's Informal Complaint, stating:

> According to your medical records on 2/10/2016, Dr. Cory, the surgeon recommended bracing of the right foot, and surgery on the left foot.  Since this consult you had a successful surgery on the left foot/ankle and your pain has increased on the right foot/ankle.  The providers on South unit have attempted on 12/13/2017, 1/18/2018 and 5/30/2018 to have you sent offsite for an orthopedic consult, and it has been ATP'd.  The current provider, NP Igwe sent an appeal to the ATP to the utilization management team and this was also denied.  Please follow the plan of care.

(*Id*. at 16.)

On August 22, 2018, Plaintiff saw NP Igwe for a functional assessment.  (Doc. 33-2 at 58.)   Plaintiff's gait was unsteady without the foot brace, but he ambulated independently with the support of the right ankle/foot brace.  (*Id*.)  Igwe noted "low and

1   [p]rotruding medial malleolus, pointing towards gravity, very low longitudinal arch."  (*Id*.)

2   Igwe assessed Plaintiff with "Pes planus worse on R foot" and that he had "mild functional

3   limitation—ambulates with foot support."  (*Id*. at 59.)  Igwe's plan was for Plaintiff to

4   continue using the foot/ankle brace, and she planned to transmit the functional assessment

5   to the regional medical director.  (*Id*. at 60.)  Igwe submitted an urgent Consultation

6   Request for off-site orthopedics.  (*Id*. at 62.)

7           On September 14, 2018, Plaintiff submitted two HNRs about the need for pain

8   medication, heat and ice treatment for his painful foot and ankle, medical insoles for his

9   shoes, and a foot tub.   (Doc. 40-5 at 17, 19.)

10          On October 2, 2018, Plaintiff saw NP Igwe to discuss the ATP of the orthopedics

11  consult request, which said: "Consider continuing conservative management.  The patient

12  continues to walk and work, and there is not objective evidence of significant changes or

13  worsening since the previous request.   Surgical correction would not be medically

14  necessary."[5]  (Doc. 33-2 at 69.)

15          Plaintiff saw Igwe again on October 4, 2018 regarding his foot pain and request for

16  medical supplies.  (Doc. 33-2 at 73.)  Plaintiff complained of right ankle pain and swelling

17  and stated that his right ankle had the same problem as his left ankle, which had been

18  surgically repaired in 2016, and that his right ankle was getting worse.  (*Id*.)  Igwe noted

19  that Plaintiff walked into the medical unit with a steady gait and erect posture, that he had

20  an ankle brace on his right ankle, and there was evidence of right foot deformity with

21  limited range of motion observed.  (*Id*. at 74.)  Igwe assessed Plaintiff as at risk for falling

22  due to right ankle deformity and she referred Plaintiff to a provider "for medical supplies

23  evaluation and approval."  (*Id*. at 75-76.)

24          On October 25, 2018, Plaintiff submitted an HNR stating that his foot hurt "really

25  bad" when walking for long periods, that it felt like his ankle was going to collapse, and he

26  requested a cane or crutch to take some of the weight off his right side.  (Doc. 40-5 at 31.)

27  Plaintiff also submitted an Inmate Informal Complaint Resolution on October 25, stating

28

    [5] The record does not indicate who wrote this ATP.

that he had been asking for help for almost two years and was being mentally and physically tormented and had lost wages and an opportunity to become a certified welder because Corizon refused to fix his right foot and ankle.  (Doc. 40-6 at 18.)

On October 26, 2018, Plaintiff saw RN Owiti and reported that his right ankle hurt with ambulation and requested a cane to take weight off his right foot.  (Doc. 33-2 at 87.) Owiti observed that Plaintiff walked into the medical unit with a steady gait and erect posture with a right ankle brace and that Plaintiff had "right ankle deformity." (*Id*. at 88.) Owiti referred Plaintiff to a provider for further evaluation.  (*Id*. at 90.)

On November 6, 2018, Plaintiff saw NP Betty Hahn for complaints of right leg pain, difficulty walking distances, and his request for a cane.  (*Id*. at 94.)  Plaintiff reported that he had to change jobs due to his inability to walk long distances.  (*Id*.)  Hahn noted that Plaintiff was wearing an ankle brace and that he walked slowly with an unsteady gait and had "deformed bilateral feet." (*Id*. at 94.)  Hahn assessed Plaintiff with "congenital bilateral feet deformity (severe)." (*Id*. at 95-96.)

On December 2, 2018, Plaintiff submitted an HNR requesting refills of his naproxen and Tylenol and asking if there was any word on the surgery for his right foot and ankle which were a "daily torment." (Doc. 40-5 at 37.)  The response from RN Jones says, "you have no consult pending" and that Plaintiff's naproxen was discontinued on October 6, 2018 and Tylenol was discontinued on August 2, 2018 and that Plaintiff could buy them from the commissary.  (*Id*.)  In an HNR dated December 4, 2018, Plaintiff wrote that he could not afford to buy pain medication from the commissary and the commissary does not sell naproxen 500 mg.  (*Id*. at 39.)  Plaintiff asked that his naproxen 500 mg be renewed because he cannot sleep at night because of sharp pains.  (*Id*.)

On December 10, 2018, Plaintiff saw NP Hahn and reported he had left foot surgery with fusion in 2016 and was told that he needed the "other surgery." (Doc. 33-2 at 97.) Plaintiff said the Roman caliber brace he had worn for 2 years was not keeping his foot from collapsing, and he now had significant, excruciating pain to his lower back, which affected his ADLs, and he had to drop out of welding certification due to the pain.  (*Id*.)

Hahn assessed Plaintiff with "severe pedis plantus/causing anxiety." (*Id.* at 98.) Hahn's plan was for Plaintiff to see Dr. Cory for evaluation and need for surgery. (*Id.* at 99.) Hahn submitted an urgent consultation request that day stating:

> Severe pedis plantus now R foot has needed surgery[.] Could we get an evaluation to see if surgery is needed o[n] his R foot[.] He is now walking with a cane and is feeling need to get this surgery done. Please at least let[']s get this evaluated by Dr. John Cory who was instrumental in his last surgery. I am also placing a SNO for a new Roman caliber brace for R foot since the other is worn out. He has even taken to trying to repair his own shoes so he can at least experience some comf[o]rt.

(*Id.* at 100.) The request was referred to the UM team; Leslie Allen issued an ATP stating "Surgical intervention would not be medically necessary. The patient continues to be able to ambulate with an assistive device. Consider conservative measures including activity modification and sho[e]."[6] (*Id.* at 102.)

On January 31, 2019, Plaintiff submitted an Informal Complaint Resolution stating that he had sharp, excruciating pains that interfered with his sleep, that he had lower back pain because only one foot had been repaired, his brace was over 2 years old and did not support him, and he was unable to do cardiovascular exercise because it was too painful to walk. (Doc. 40-8 at 7.) On February 14, 2019, Plaintiff submitted an Inmate Grievance about his right foot and ankle, which he said was getting worse every day because he had one foot that was repaired and straight and the other was collapsed, and the support brace was not helping with the pain. (*Id.* at 10.)

On February 20, 2019, Plaintiff saw NP Hahn and reported that he had difficulty walking and with his ADLs, he had to quit working, and he was wearing shoes provided by his family. (Doc. 33-2 at 105.) Hahn noted Plaintiff was wearing a right ankle brace and had an "unsteady ataxic gait." (*Id.*) Hahn planned a "consult for podiatry to evaluate/insoles were ordered as per ATP await consult results." (*Id.* at 107.) Hahn

---

[6] The record lists Allen as "Staff." (Doc. 33-2 at 100.)

submitted a consultation request that day for offsite podiatry because the ATP suggested "T insoles instead of surgery," and Hahn wrote, "consider seeing orthopedics again due to inability to adequately walk or work due to ankle foot pain in bilateral feet. 2nd request please consider sending him as well I am going to request the insoles as per the ATP recomm[e]ndations." (*Id*. at 108.) The off-site podiatry request was authorized on March 6, 2019. (*Id*. at 109.) On March 11, 2019, Lesli Allen recommended an ATP for the orthopedics request stating, "surgical intervention would not be medically necessary. The patient continues to be able to ambulate with an assistive device. Consider conservative measures including activity modification and shoe inserts." (*Id*. at 110.)

On April 5, 2019, Plaintiff was seen by Dr. Jess Price at East Valley Foot and Ankle, where the podiatrist observed that Plaintiff had "severe, rigid collapse of medial arch [right] foot, calcaneal valgus and equinus deformity on [right]." (*Id*. at 116.) The podiatrist noted that the custom brace had helped but did not fully support, that previous injections were only helpful for a few days, and that the previous procedure by Dr. Cory on the left foot worked well. (*Id*.) The podiatrist diagnosed Plaintiff with pes planus, "PT dysfunction, equinus [right] LE" and recommended that Plaintiff return to Dr. Cory for surgical treatment on his right foot and ankle and noted that Plaintiff would "likely need triple arthrodesis and achilles lengthened." (*Id*.) Dr. Price gave Plaintiff an injection in his right foot. (*Id*.)

On April 9, 2019, Plaintiff saw NP Hahn, who submitted a consultation request that day for Plaintiff to see Dr. Cory. (*Id*. at 125.) The UM team requested more information, specifically, whether Plaintiff could "ambulate with his brace" and if he could shower and dress himself with the brace. (*Id*. at 131.) Hahn responded that Plaintiff could not ambulate, shower, dress himself, or complete any of his ADLs without the brace. (*Id*. at 132.) The request was denied, and an ATP issued by Artemisa Cordova stating, "Per MBartels ATP: Surgical intervention would not be medically necessary. The patient continues to be able to ambulate with an assistive device such as a brace or cane. Consider

1  conservative measures including activity modification and continued use of assistive
2  device/inserts." (*Id*. at 133.)

3      On May 15, 2019, Ayodeji Ladele, DO, submitted a consultation request for an
4  offsite orthopedics visit based on the podiatrist's recommendation. (*Id*. at 136.) The
5  request was approved on May 28, 2019. (*Id*.)

6      On June 4, 2019, Plaintiff saw Dr. Cory. (*Id*. at 143.) X-rays taken that day showed
7  "severe pes plano valgus deformity . . . mid foot collapse with arthritic changes of the
8  dorsal medial and central column . . . ." (*Id*.) Dr. Cory recommended surgery consisting
9  of "joint fusion with lateral column lengthening using a fiber metal wedge," "bone grafting
10 from proximal tibia," and "repair of spring ligament." (*Id*.) On June 6, 2019, NP Hahn
11 submitted an urgent consultation request for the surgery recommended by Dr. Cory. (*Id*.
12 at 148.) The surgery was approved and scheduled. (*Id*.)

13     Plaintiff had the surgery on June 28, 2019. (*Id*. at 150.) Plaintiff saw RN Owiti
14 upon his return to the prison that same day. (*Id*. at 155.) Owiti noted that Plaintiff was in
15 a wheelchair, had a dressing on the right ankle from the surgical procedure, and Plaintiff
16 was able to wiggle his feet. (*Id*. at 156.) Plaintiff was prescribed Tylenol #3 twice daily
17 as needed for pain and a SNO was issued for meals in his quarters and medical ice. (*Id*. at
18 157-158.)

19     As of July 1, 2019, Corizon was no longer the provider of certain healthcare at
20 certain health facilities within the ADC. (Doc. 33 ¶ 52.)

21     On July 9, 2019, Plaintiff saw RN Thomas upon his return from an appointment
22 with Dr. Cory.[7] (Doc. 33-3 at 2.) Plaintiff had a hard cast on his right leg, could wiggle
23 his toes, and denied pain. (*Id*. at 3.) On July 10, 2019, NP Hahn submitted an urgent
24 consultation request for Plaintiff to return to Dr. Cory in two weeks for the cast change
25 requested by Dr. Cory. (*Id*. at 7.)

26     On August 1, 2019, Plaintiff was sent to the wrong office and his appointment with
27 Dr. Cory was rescheduled for August 8, 2019. (*Id*. at 21.) When Plaintiff saw Dr. Cory

28

_____

[7] Defendant's do not submit any records of this visit from Dr. Cory's office.

on August 8, 2019, x-rays showed no evidence of delay in healing and Plaintiff's incisions were well healed.  (*Id*. at 23-24.)  Dr. Cory applied a walking cast to Plaintiff's right leg and said Plaintiff was to return in three weeks for x-rays and a cast change.  (*Id*. at 24.)  On September 12, 2019, Plaintiff saw Dr. Cory, who noted Plaintiff was doing well post-surgery.  (*Id*. at 37.)  A CAM boot was provided to Plaintiff, and he was to return in 6 weeks for follow up and possible x-rays.  (*Id*.)

## IV.     Eighth Amendment Legal Standard

To support a medical care claim under the Eighth Amendment, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  There are two prongs to the deliberate-indifference analysis: an objective standard and a subjective standard.  First, a prisoner must show a "serious medical need." *Jett*, 439 F.3d at 1096 (citations omitted).  A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted).

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent.  *Jett*, 439 F.3d at 1096.  "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment." *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted); *see also Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) (quoting *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988)).  Deliberate indifference may also be shown where prison officials fail to respond to a prisoner's pain or possible medical need.  *Jett*, 439 F.3d at 1096.  "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, [courts] need not defer to the judgment of prison doctors or administrators.'" *Colwell v.*

1    *Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (quoting *Hunt v. Dental Dep't*, 865 F.2d

2    198, 200 (9th Cir. 1989)).

3          Deliberate indifference is a higher standard than negligence or lack of ordinary due

4    care for the prisoner's safety.  *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).  "Neither

5    negligence nor gross negligence will constitute deliberate indifference." *Clement v.*

6    *California Dep't of Corrs.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also*

7    *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (mere claims of

8    "indifference," "negligence," or "medical malpractice" do not support a claim under

9    § 1983).  "A difference of opinion does not amount to deliberate indifference to [a

10   plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).  A

11   mere delay in medical care, without more, is insufficient to state a claim against prison

12   officials for deliberate indifference.  *See Shapley v. Nevada Bd. of State Prison Comm'rs*,

13   766 F.2d 404, 407 (9th Cir. 1985).  The indifference must be substantial.  The action must

14   rise to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105.

15   Even if deliberate indifference is shown, to support an Eighth Amendment claim, the

16   prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see*

17   *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical

18   treatment does not constitute Eighth Amendment violation unless delay was harmful).

19         To maintain a claim against a private entity such as Corizon, Plaintiff must meet the

20   test articulated in *Monell v. Department of Social Services of City of New York*, 436 U.S.

21   658, 690-94 (1978).  *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012)

22   (applying *Monell* to private entities acting under color of state law).  Accordingly, Corizon

23   may only be held liable under § 1983 for its employees' civil rights deprivations if Plaintiff

24   can show that an official policy or custom caused the constitutional violation.  *Monell*, 436

25   U.S. at 694.  To make this showing, he must demonstrate that (1) he was deprived of a

26   constitutional right; (2) Corizon had a policy or custom; (3) the policy or custom amounted

27   to deliberate indifference to Plaintiff's constitutional right; and (4) the policy or custom

28   was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty.*,

*Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001).  Further, if the policy or custom in question is an unwritten one, the plaintiff must show that it is so "persistent and widespread" that it constitutes a "permanent and well settled" practice.  *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)).  "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

**V.     Discussion**

      **A.     Serious Medical Need**

Defendants do not argue that Plaintiff's severe pes planus, collapsed ankles, and pain were not serious medical needs.  Plaintiff and his medical records document Plaintiff's history of foot deformities, the need for orthoses, complaints of pain, difficulties walking and with his ADLs, and subsequent diagnoses necessitating surgery in 2016 and 2019.

This record supports that Plaintiff suffered a serious medical need.  The analysis therefore turns to the deliberate-indifference prong.

      **B.     Deliberate Indifference**

            **1.     Corizon**

Defendants Corizon and Shinn argue that Plaintiff has failed to provide any evidence supporting that Dr. Cory's post-surgery instructions in July 2016 were not followed or that Dr. Cory recommended pain injections and surgery on his right foot.  (Doc. 32 at 17-18.)  Plaintiff, though, has presented evidence in the form of his own averments in his Complaint and Response that these were Dr. Cory's recommendations, and the Court must accept as true evidence that is based on Plaintiff's personal knowledge.  Moreover, the Court instructed Defendants to provide the records from Dr. Cory from the left foot surgery and Plaintiff's follow-up visits with Dr. Cory and other outside providers, but Defendants only provided Corizon's consultation forms, which provide minimal information, leaving the Court to draw all inferences in Plaintiff's favor.  Defendants also

argue that Plaintiff received the offloading brace for his right foot that was recommended by Dr. Cory, that Plaintiff's complaints of pain were timely and appropriately addressed, that conservative measures were recommended in lieu of surgery "when medical need for surgery was not found," and that while there was a "slight delay from the time the podiatrist recommended a surgical evaluation and Plaintiff receiving that surgical evaluation, the delay does not rise to the level of deliberate indifference—it would be mere negligence at best." (Doc. 32 at 18-19.)

Corizon's own providers began requesting a surgical consult for Plaintiff's right foot in December 2017, and consultation requests were again requested in January, May, August and December 2018, and in February 2019, and each of those requests were denied and ATPs issued. Plaintiff did not see a podiatrist until April 2019, and although that podiatrist recommended Plaintiff see Dr. Cory about having surgery on his right foot, the follow-up consultation request was also denied, and an ATP issued. It was not until Dr. Ladele requested an orthopedics consultation request in May 2019 that Corizon allowed Plaintiff to again see Dr. Cory. When Plaintiff saw Dr. Cory in June 2019, Dr. Cory found severe deformity in Plaintiff's lower right extremity and recommended surgery, which was approved by Corizon, and Plaintiff had the surgery on June 28, 2019.

Plaintiff avers that Dr. Cory said he was to have surgery on his right foot one year after the July 2016 surgery on the left foot. Defendants offer no explanation why it took 3 more years for Plaintiff to have even a surgical consult for his right foot, and a year and half after Corizon's own providers began requesting the consult. Defendants argue generally that "medical need for surgery was not found" prior to Plaintiff's consultation with Dr. Cory in 2019, but the evidence does not support that whoever made these determinations was more qualified than Dr. Cory, a specialist, and Corizon's own providers who repeatedly requested surgical consultations. Nor is it clear that Plaintiff's complaints of pain were timely and appropriately addressed given the substantial delay in sending Plaintiff for an orthopedics consultation for his right foot, which might have alleviated Plaintiff's pain. And, by not providing the medical records, Defendants have not refuted

Plaintiff's evidence that Dr. Cory recommended Plaintiff have injections for pain after his first surgery.  Also, the evidence reflects that Plaintiff repeatedly complained of severe pain in his lower right extremity, the imbalance in the length of his legs causing pain in his back, difficulty in performing his ADLs, and having to discontinue his education program due to pain, which indicates that Plaintiff's pain was not timely and appropriately addressed.  *See Estelle*, 429 U.S. at 103 (Eighth Amendment applies even to "less serious cases, [where] denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose"); *Jett*, 439 F.3d at 1097-98 (finding sufficient evidence of harm caused by 6-month delay in surgery for fractured thumb where the prisoner's thumb healed improperly); *McGuckin*, 974 F.2d at 1060 (pain and anguish suffered by prisoner constituted harm sufficient to support a § 1983 action).

A jury could conclude that Corizon's failure to provide Plaintiff with an orthopedics consultation for 3 years after the specialist recommended Plaintiff have surgery on his right foot and despite repeated requests for the consultation by Corizon's own providers for over a year and a half was the result of deliberate indifference to serious medical needs.  The Ninth Circuit and other courts have routinely found that failure to follow a treating specialist's or a treating physician's recommendation may amount to a course of treatment that is medically unacceptable.  *See Colwell v. Bannister*, 763 F.3d 1060, 1069 (9th Cir. 2014) (denying summary judgment where prison officials "ignored the recommendations of treating specialists and instead relied on the opinions of non-specialist and non-treating medical officials who made decisions based on an administrative policy"); *Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012) (where the treating physician and specialist recommended surgery, a reasonable jury could conclude that it was medically unacceptable for the non-treating, non-specialist physicians to deny recommendations for surgery), *overruled in part on other grounds by Peralta*, 744 F.3d at 1083; *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999) (the defendant physician's refusal to follow the advice of treating specialists could constitute deliberate indifference to serious medical needs).

Moreover, a reasonable jury could conclude that the delay in getting Plaintiff to a specialist and denials of its own providers' consultation requests for specialist care for a year and a half were not the exception to the policy, but the rule, and thereby constituted a custom or practice of deliberate indifference that was the moving force behind the constitutional violation. *See Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1194-95 (9th Cir. 2002) (whether a policy or custom exists is normally a jury question); *Oyenik v. Corizon Health Inc.*, No. 15-16850, 2017 WL 2628901, at *2 (9th Cir. June 19, 2017) (stating "[t]here is no case law indicating that a custom cannot be inferred from a pattern of behavior toward a single individual" and finding that a reasonable jury could conclude that at least a dozen instances of defendant Corizon denying or delaying consultations and radiation treatment for cancer patient over a year amounts to a custom or practice of deliberate indifference) (citing *Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1478 (9th Cir. 1992)); *Mi Pueblo San Jose, Inc. v. City of Oakland*, C-06-4094 VRW, 2006 WL 2850016, at *4 (N.D. Cal. Oct. 4, 2006) (Whether actions by entity officers or employees amount to a custom "depends on such factors as how longstanding the practice is, the number and percentage of officials engaged in the practice, and the gravity of the conduct.").

Accordingly, there are disputed issues of material fact whether Defendant Corizon had a policy, practice, or custom that resulted in a violation of Plaintiff's Eighth Amendment rights and the Court will deny summary judgment to Defendant Corizon.

### 2. Shinn

Defendants argue that because Plaintiff has received the relief he sought in his Complaint, i.e., surgery on his right foot and follow-up care, "injunctive relief against Ryan/Shinn would be medically inappropriate" and the ADC Director is entitled to summary judgment.  (Doc. 32 at 20.)  Plaintiff argues that the ADC Director is liable as a supervisor and that Ryan/Shinn was "aware of Plaintiff's medical issues" and could have become involved but failed to do so.  (Doc. 39 at 13.)

1       Plaintiff misunderstands the claim against the ADC Director.  Supervisory liability
2  only exists in a claim against a supervisor in his individual capacity for damages, but at
3  screening, the Court only determined that Plaintiff stated a claim against the ADC Director
4  in his official capacity for injunctive relief, not damages.  *See Hafer v. Melo*, 502 U.S. 21,
5  27 (1991) (a state official may be sued in his or her official capacity for prospective
6  injunctive relief); *Coalition to Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1134
7  (9th Cir. 2012) (the Eleventh Amendment does not bar suits for prospective declaratory or
8  injunctive relief against state actors in their official capacities).

9       Plaintiff's Complaint and subsequent motion for injunctive relief sought surgery on
10  his feet.  (Doc. 1 at 9; Doc. 3 at 2.)  The record reflects that Plaintiff had surgery on his left
11  foot/ankle in July 2016 and on his right foot/ankle in June 2019.  Plaintiff has not presented
12  any argument or evidence showing that he is entitled to or is seeking any further injunctive
13  relief.  As such, Plaintiff's claim against the ADC Director is moot, and the Court will grant
14  summary judgment to Defendant Shinn and dismiss him from this action.

### 3.  Centurion

16       Centurion was added as a Defendant with respect to Plaintiff's request for injunctive
17  relief.  Because Plaintiff's injunctive relief request is moot, the Court will grant summary
18  judgment to Centurion and dismiss it from this action.

19  **IT IS ORDERED:**

20       (1)   The reference to the Magistrate Judge is withdrawn as to Defendant
21  Centurion's Motion for Summary Judgment (Doc. 26), Defendants Shinn and Corizon's
22  Motion for Summary Judgment (Doc. 32), and Plaintiff's Motion for Default Judgment
23  (Doc. 44).

24       (2)   Defendant Centurion's Motion for Summary Judgment (Doc. 26) is **granted**,
25  and Centurion is **dismissed with prejudice**.

26       (3)   Defendants Shinn and Corizon's Motion for Summary Judgment (Doc. 32)
27  is **granted in part and denied in part**.  The Motion is **granted** as to Defendant Shinn, and
28  Shinn is **dismissed with prejudice**.  The Motion is **denied** as to Defendant Corizon.

1    (4)    Plaintiff's Motion for Default Judgment (Doc. 44) is **denied**.

2    (5)    The remaining claim is Plaintiff's Eighth Amendment claim against

3    Defendant Corizon.

4    (6)    This matter is referred to Magistrate Judge Michael T. Morrissey for a

5    settlement conference.

6    (7)    Counsel for Corizon shall arrange for the relevant parties to jointly call

7    Magistrate Judge Morrissey's chambers at (602) 322-7680 within 14 days to schedule a

8    date for the settlement conference.

9    Dated this 4th day of November, 2020.

James A. Teilborg
Senior United States District Judge